Good morning, Your Honors. May it please the Court, Nadia Dahab for Plaintiff Appellant Haley Olsen. I'm going to attempt to reserve about five minutes for rebuttal argument. Your Honors, this case presents essentially questions again, which we heard in the last case relating to qualified immunity, but in the Fourth Amendment context. In this case, Plaintiff Olsen alleged that Defendant Carpenter, who is the local district attorney and county counsel for Grant Farmer, who was the county sheriff, violated her Fourth Amendment rights when they requested, obtained, and at least with respect to Defendant Carpenter, viewed a copy of the extraction of her cell phone, which lawfully had been seized by the Idaho State Police. Defendants did so without a warrant, without any suspicion of criminal activity, and outside the scope of the consent that Plaintiff had given to the Idaho State Troopers. That, in Plaintiff's view, under clearly established law, is unconstitutional. The District Court granted summary judgment as to both defendants. As to Defendant Carpenter, the District Court found that, or declined to resolve the question of whether he had violated Plaintiff's constitutional rights, but held that, you know, if he had, those rights were not clearly established. With respect to Sheriff Palmer, the District Court concluded both that there was no constitutional violation, and that even if there were, the right was not clearly established as well. The clearly established analysis, I think, is the same with respect to both defendants, so I'll start there. And the authorities that the counsel in the prior case, of course, talked about with respect to how this court determines whether a right is clearly established, apply equally in this case. The question, of course, is whether the law is sufficiently clear that every reasonable official would have understood that what they were doing was unlawful. The purpose, of course, as Judge Clifton articulated, is to protect all but the plainly incompetent or potentially corrupt. The question needs to be resolved, or it needs to arise in a specific context, but this court, fairly recently in Hampton v. California, made clear that the binding case law need not catalog every single way in which the conduct could be unlawful. So what, when we're looking at the clearly established right, how do you define that? In this case, the clearly established right is Plaintiff's right to be, I mean, it's, I hesitate to say it this way, but it's relatively broad, Plaintiff's right to be free from an unreasonable search of the contents of her cell phone. But that actually kind of cuts against the whole jurisprudence we have about high level. So let me just tell you kind of what I thought might be the constitutional right, but then I'm interested to hear whether it's clearly established. And that is review of a consented to extraction of a cell phone by a different law enforcement agency. I think that is correct. I think the clearly established right has to include the question of consent, right? Or consented to with respect to one agency, potentially unconsented to with respect to the other. And whether review by the other agency violates her right to be free from, is an unreasonable search and seizure in violation of the Fourth Amendment. I think the cases that tell us that that is clearly established are Raleigh versus California, of course, which tells us that the search of a cell phone requires a warrant. That case, of course, has an incident to arrest exception. But the holding in the very first sentence of the case and the holding at the end is that search of a cell phone requires a warrant or the well-established exception, which is consent. Florida versus Jimeno and all of the cases that follow it, Illinois versus Rodriguez, Stoner versus California, which tell us that the scope of the consent is limited to the terms of the authorization. Can we go back to Raleigh? Raleigh talks about search incident to arrest, so we have that as clearly established. But then the Supreme Court did that thing that it often does, which is, ah, you know, and then leaves us to figure out. And so it said, but it didn't implicate whether that, whether aggregated data is a search under other circumstances. So what do we make of that little additional phrase that the Supreme Court threw in there that it didn't decide? I don't know. I'll be honest. I don't know what aggregated data in this, I don't know what the Supreme Court is referring to when it says that. It feels like to me the way I, the way I read it, something very different than the individual search and seizure after a traffic stop that happened here. That's potentially more akin to the Carpenter versus United States facts where you're, where the, the government sought to collect data from a third party there, but aggregated data relating to, you know, location information from a cell provider, service provider. And in fact held there before the, before this case arose, that even there, when the, when the government seeks to collect data of that nature, of that degree of, you know, providing that degree of private information about an individual, a warrant is required there too. And the Fourth Amendment protects even that information, even where that information was lawfully collected by a third party, lawfully created by the third party. A warrant is required in those circumstances. So I would, I guess to get back to your question, Judge McEwen, I don't know that, that that, I agree that Riley does this thing where it says this case is narrow, but I don't know that there's any other way to read Riley other than in this, in, in the, in the police stop circumstance, a warrant is required to search a cell phone. But here there was consent of some scope. There was.  So, I mean, what if, what if Idaho authorities had found on the phone evidence of another crime, like a federal crime? Could they have turned the phone over to the FBI? Could the FBI have accepted that phone without a warrant and searched it? I think there, potentially, you know, I think that the Lieutenant Carpenter raises lots of federal statutes that allow in certain circumstances where there is evidence of criminal activity and they are using the information to pursue legitimate law enforcement activities, information to be shared. And without sort of conceding one way or the other, Judge Brass, whether that would be permissible in those, in that hypothetical circumstances, there may be some set of facts where Idaho could share that evidence of legitimate criminal activity with another law enforcement agency. But the implication of your answer is that there needs to be some reasonable basis to do that.  So, in other words, that's assuming we read the search to mean, hello, Idaho, yeah, you can look, you, Idaho, and if I end up in Idaho court, you can use this. Assuming she did circumscribe her consent, you're saying that that consent could be overridden if there was evidence of additional crimes. I think, I want to be careful here, both because I don't want to, you know, concede anything with respect to this case, and I'm, you know, not, I want to be careful with how my degree of familiarity with the federal statutes that allow information sharing. Some of those statutes, one of which, Defending Carpenter Cites, requires or at least allows for a post transmission application to a neutral magistrate that would then sort of satisfy the warrant requirement. I don't know if you have got a limited scope of consent and no other basis, which is the evidence here, no other evidence of criminal activity, and no other protective scheme that will allow a neutral and detached magistrate to evaluate whether a warrant before the search or after, you know, authorized the search, that it's lawful, it's lawful. I mean, it's the scope of the consent that is the focus of my concern. That is the real question. Can they stretch the rubber band far enough to permit what defendants did, and in the qualified immunity context, what law do we have, what can you point to that tells us that stretches the rubber band too far, that the overt terms of the consent wouldn't seem to permit this? So the problem is, what is it that should put defendants on notice by the qualified You can't ask Idaho and take from Idaho the copy of what was in the cell phone. So what would you point us to to say that's clearly established? We cite in our brief the Supreme Court's decision in the Florida v. Jimeno case, which is sort of the standard for consent being limited to the scope of the authorization. And then we cite the Stoner case in Illinois v. Rodriguez, sort of reaffirmed that standard and require objective reasonableness based on, or state that that's determined based on an objective standard, right, that it's the objective reasonableness of the officer's determination of the facts before them. Here I would say there is at the very least a dispute of fact on this question, because one, looking at the terms of the authorization, it's not clear on the record, on this record whether Oregon's, whether these defendants had the terms of the authorization before them. But we know... Which may mean, is it really the Idaho authority that turned information over without either side? I mean, apparently the terms of the consent weren't communicated. And the reason for the inquiry may not have been clearly understood by the people in Idaho. What we have here may be a failure to communicate. And how does that play out? What law tells us that we focus on these defendants, that what they did crossed the line and that was clearly established that it crossed the line? These defendants were the defendants that conducted the search at issue in this case. Well... The search being the review of the cell phone extraction. In Oregon. In Oregon. But the extraction took place in Idaho and they were sent by Idaho authorities. Sure, it's certainly true that the seizure took place in Idaho. But I don't know that that makes the different agencies' review of the contents of a cell phone any less a search. It's not a seizure. But it's no less a search within the meaning of the Fourth Amendment. And why defendant Carpenter did not have the consent form, he got this information from Idaho, why wasn't it reasonable for him to essentially receive it when he asked for it? And reasonable to believe that they could send it to him? I think, thank you for that question, Judge Brass. I think there's at very least a dispute of fact on that question. You know, the record in this case is that Sheriff Palmer called up, called the state trooper in Idaho who refused to give Sheriff Palmer the information, the information from the cell phone. Sheriff Palmer then went to defendant Carpenter and said, can you please get this information? And there's, we think there's plenty of evidence of that in the record as well. Palmer says to Sheriff, I'm sorry, Carpenter says to Sheriff Palmer, I'll attempt to do that. And then he writes a letter to Idaho explaining what he understood to be the scope of the consent, which was, and this is at ER 225. He knew that Olson had to agree to allow law enforcement, the Idaho law enforcement, to look at her cell phone, and he knew that a cell phone dump took place. I don't think that that, if that's what Mr., if that's what defendant Carpenter knew, that's not consent to an outside jurisdiction to search and review the contents of her cell phone. And so I don't, and he says, can I please have a copy of that cell phone? And Idaho, of course, provides it. I don't know that that's sufficient to give defendant Carpenter, who bears the burden to establish the constitutionality of the search, a reasonable basis to rely on the scope of consent as he understands it. I will say. So let's, and I want to kind of separate these two. So Carpenter says, well, I'm kind of hunting for possible Brady information that might implicate, in case this guy Smith has to testify, is that the justification that we have? That's the justification that he has after the fact. It's not the justification that he gave to Idaho. He tells Idaho that there's some workplace investigation about the troop, the deputy whose business card was found in plaintiff's car. Right. So these are sort of the post hoc, in our view, rationalizations for what was going on here. The evidence on this record is that Palmer says initially that he was looking for evidence of an illegality. He later sort of turns around and says, well, I was actually more out of curiosity. Right. That's Palmer. That's Palmer. But Carpenter is like, apparently, at least after the fact, saying it's because there could be potential Brady material, which I didn't quite understand. I will say, nor do I, Judge McHugh. And I think the idea is that he's looking for potential, you know, information that he has to disclose, should his deputy take this.  But we have no proceeding pending in which Brady is implicated. Exactly. With that, I will review. We will put three minutes on the clock when you come back up. Thank you. I understand the appellees are splitting time. So Mr. Whitehead, you're first. That's correct.  May it please the court. Counsel Carson Whitehead for Defendant Appellee Carpenter. I'm splitting time with counsel for Sheriff Palmer. So I'd like to start where the court was just discussing with opposing counsel about whether the right is clearly established and what is that right. And I think here the right is whether plaintiff retained their Fourth Amendment privacy interest in a copy of the cell phone data that Idaho lawfully obtained and then that Idaho as a third party transferred to District Attorney Carpenter. And what the district court here found was that there is no case law from the Supreme Court or from this court on that issue. And as we put in our brief, there's a recent decision from the Supreme Court of Maryland that kind of goes through in extensive detail cases that have addressed this issue and finds that there's a split and there's no no binding federal precedent in this jurisdiction. And so I don't see how plaintiff can overcome that clearly established hurdle. And it is her burden to overcome it when what Riley says is that there's yes, an individual has a privacy interest in cell phone data. But that case concerned a search incident to arrest where the officers were searching the phone that was found in the defendant's pocket. This is a consented to search. So let's start there. It is in your view it is a search. Yes. So we are. You're dancing on that. Yes or no. Is it a search? We did dance. So I don't think. Well, if she doesn't have to. She doesn't retain a privacy interest in the data. But let's answer the question first, because you always jump to the second prong. But in your view, is this not a search? Well, I say I don't think it's clearly established that it's a search. I'm asking you if it's a search. If there were no consent, would it be a search? Yes, Your Honor. OK. So we're talking here about scope of consent, not so much whether they looked at something that otherwise they wouldn't be able to look at. I think that's correct. Although I'm hedging there because this notion of the state receiving this material from a third party. Because Idaho isn't in this case. And if I'm not quite sure. Let me change the facts. Yes. Suppose we have the letter from the prosecutor, Mr. Carpenter, giving a brief explanation for the reason for the inquiry, the internal investigation as to the activities of deputy whatever. I don't recall his name. Maybe they didn't give the name here. Suppose the communication, probably not in letter form, had been, hey, I hear there's a really attractive woman and there are pictures of her naked. Can we take a look at those? Is there any real question that the consent that had been given by plaintiffs to the Idaho authorities probably didn't extend to the point of saying, yeah, you can look at this thing for puring of interest. And I agree with that, your honor, would not take the position that for any that this activity would be permissible for any and all purposes. So we understand there's a limit to the consent. And so the problem again for me is how far does that rubber band stretch is the reason that was given by the prosecutor sufficient either to justify or to make it something short of clearly established that this isn't something that he couldn't do. So I think that the motive is motivations in seeking the material were related to Brady versus Maryland. And it was, it wasn't case specific, but the evidence of the record from his deposition testimony was that, that deputy Smith is, you know, he's called upon to testify regularly in criminal cases and that he was concerned if deputy Smith was involved in the trafficking of marijuana in the state of Idaho where marijuana is illegal, that was the basis of the Brady concern. And I think, you know, to me, that is a trumped up concern that that's like, well, I kind of want to look at this stuff. If you had a pending proceeding and deputy Smith is about to testify, we'd have a different situation here, but we don't have that. And that's right. Your Honor, this, this was kind of prospective concern about fulfilling duties under Brady versus Maryland. And on the other agencies, it's kind of interesting. The trooper said, no, I'm not turning it over. And then other agencies were asked, no, because there's no allegations of a crime, nothing's pending here. There's no crime. And Carpenter had never before looked kind of in the abstract for Brady evidence. So that's the trouble I'm having with Mr. Carpenter is that if he didn't review the consent form and he gets this information, what's legitimate basis for him having this  So, and I do want to speak briefly about the consent form since that's come up. And the record does show that that defendant Carpenter had a discussion with Trooper Andrus from Idaho. That's in the letter that District Attorney Carpenter sent to the Jerome County prosecutor in Idaho. So he had had a discussion with the trooper. I think what Sheriff Palmer's deposition shows that the trooper was concerned that there was an ongoing investigation. So why, why am I giving this Idaho information to an Oregon sheriff? And also some concerns that if Oregon sheriff's deputy was implicated, concerned about what's happening in the, the grant county sheriff's department. So I think that was the, what the record reflects is the reason why the Idaho trooper was hesitant to turn this material. Well, he was, he was smart. That's what I would call him. You know, it was prescient that you don't go turning this over. So that, that brings me to that Setagahi case where we said, well, you can get information lawfully, but if you're going to have a further search of lawfully obtained information, then you need a warrant. Why isn't that exactly the situation we have here? Well, again, I think it goes back to that, I mean, the, the clearly established question of, of kind of what, what was her retained privacy interest in this, the, the data that she consented to Idaho collecting and receiving. So I, I don't think it's the, the, the, the question of a further search of that same. Is your position that once she turned over the phone and consented to it, she had essentially lost that phone as a, in terms of an expectation of privacy, anything could be done with it after that? No, your honor. I mean, our, our position on that, I know that maybe this is a frustrating answer. I mean, I don't think the state of, like the state of Oregon's not saying that, that any, any cell phone data, whenever a copy is given, that forever that right is lost. But I, but I, I don't think that the, the case law has established that, that a, that a copy, that you have full retained privacy interest in a copy when you consent to that copy being made. And so the, the narrow question for qualified immunity is whether that right is clearly established. And I, I mean, I think that. But isn't it, isn't it integrated with the consent if, and I know you might not agree with this, but if the consent really is, here's my cell phone and yeah, you can use it because I'm now being arrested in Idaho for purposes of this or for court proceeding relating to this crime. And then you use it for a different purpose or you send it to Oregon or why not just send it out nationally? You know, I mean, I don't see any difference between sending it to Oregon and putting it on the internet practically. Well, Your Honor, I, I, I think your question highlights one of the difficulties with this case is that we don't have Idaho in it and that Idaho is the party that released the data to Oregon. So the question is, is, is it a violation of constitutional law for Oregon to ask for and review this data that was willingly given to it by a third party? And I think that wraps around to the apparent authority issue where we think both on the facts and on that, that the facts show that, uh, that, uh, District Attorney Carpenter had a reasonable, objectively reasonable belief. Was there a suspicion that Deputy Smith had committed a crime? The record states that, that there was not suspicion that Deputy Smith had committed a crime. Could they have even asked for a warrant for this? What would have been the basis for, for applying for a warrant for this? Well, and that's, and District Attorney Carpenter said on, on the record that he didn't think he needed a warrant because there was no suspicion of a crime. So I'm, I'm not aware. That makes it even worse. Well, I, I, and I, I understand that, Your Honor, then maybe he would have tried to subpoena it and then there would have been notice to, um, Ms. Olson and she could have objected. So there certainly could have been a process, different decisions could have, could have been made by the, the District Attorney here. But I think the, the question is, is whether this is a clearly established violation under the qualified immunity standards. I know I sound like a broken record on that piece. I mean, I, I apologize for that. You play the card you've got. It's a good position to take. That's correct, Your Honor. So I think under, under the qualified immunity standards that this doesn't show the sort of, of incompetence or wrongdoing that would require to overcome that hurdle. And I see that I'm, I'm getting into my co-counsel's time. So we ask that you affirm as to DA Carpenter. Thank you. Thank you. Good morning, Your Honor. It's my pleasure to court Aaron Heisel on behalf of Sheriff Palmer. Um, I have more notes than time, but I have different cards to play too. So there's that. Um, I take issue with the introductory statements by my friend here that, um, this case is about these defendants searching, these defendants observing, these defendants getting those things because my client did not do any of those things. And so, and that goes to prong one. And then on prong two during her introductory statements, she said the standard is the same as to both of them and it is not. And those are the two things I want to focus on. As to that prong one, there are, there, and she did, she did tell you that the district court separate and distinctly said, I'm going to reserve a ruling on the actual fourth amendment as to Carpenter. But she did not reserve that ruling as to my client. She found that there was no violation of the fourth amendment at all as to Sheriff Palmer. And then she went on and separately and distinctly analyzed. It was Sheriff Palmer who started the ball rolling here. Sure. None of this would have happened but for his inquiry. He received the phone call initially from Idaho and he was the one that passed that information off to, um, Carpenter, correct?  Um, the, the critical piece though is we don't have vicarious liability in section 83. And we certainly don't have strict liability. So the, the, the whole that they try to force these facts through as to Sheriff Palmer is supervisory liability. So let's, why don't you lay out for us actually exactly where Palmer fits into the story. We just covered it. It was exactly that. Got the phone call. He received the phone call from Idaho. And then? And then he told DA Carpenter. So Carpenter. Yep. And those are, the entirety of what they cite to on that conversation in the record is at 3 ER 489. And the, there are five instances in the opening brief where they characterize that conversation because they're trying to go the supervisory liability route as Sheriff Palmer directing or instructing DA Carpenter to go get this cell phone data. Did Palmer look at the cell phone data? No. Did deputies look at the cell phone data? No. No deputies within Palmer's department? No. So in your view, the only thing Palmer did was get a phone call and let DA Carpenter FYI. Yes, Your Honor. And I want to finish that thought because I think it's important. The reason I'm highlighting this, this distinction about them saying that Palmer instructed or directed the district attorney to do something because they're trying to get this supervisory liability hook is because the opening of the argument and the reply brief is literally that they are entitled to an inference from the portion of the transcript I just cited you to, that it was that instruction, that's an inference they're, they're granted and that that has the legal effect of making Sheriff Palmer liable as, quote, personally participating in the allegedly unlawful conduct. And until I stepped up here today, there had not been any conversations hardly about my client because he wasn't involved. I mean, I'm just in this different orbit of, of things. Well, if we skip to the end, I mean, the underlying injury suggested is that somehow photographs got passed around within the Sheriff's office. We don't get to that part of the case, so . . . Yeah, and you're . . . But, but that does shine a light on the Sheriff's office and wonder, gee, how did that happen? Whose responsibility is that? I think that, I've been the attorney on this case from the beginning, and there have been some pieces of evidence that have been raised and then not stood on for what I believe are good reason. And I do not see in the opening brief anywhere where they're trying to rely on any of those evidence that the district court put in footnotes as to why that evidence, even at summary judgment, was not really being stood on. And I don't see that anywhere in the briefing. I think that's intentional, and I would think that those things are waived as to those tangential connections to the Sheriff's departments as a whole, and certainly take issue that there's nothing in this record that connects anything to Sheriff Palmer. There is nothing that makes that leap. And then I think it's very telling that on this supervisory liability analysis as to my client, the case that the district court relied on is dispositive. It's Philarka. I'm probably going to mess up the defendant's name, Bigiorno. And no supervisory liability over those you are not the supervisor of. Not rocket science. And there's no reason to believe that those others would take action in violation of the Constitution, which breaks that causal chain. That's exactly where Sheriff Palmer sits in this story, and I would ask you to affirm. Thank you. Three minutes. Thank you, Your Honors. Briefly, I want to pick up where my friend on the other side left off on Sheriff Palmer, because we didn't have a chance to discuss that in the beginning. Factually, I want to be careful. I think the record here, plaintiff is entitled to all reasonable inferences in her favor. And so I don't know that there's any statement that Sheriff Palmer didn't testify that he instructed Carpenter, but there's plenty of testimony in the record about him making the request of Carpenter. I think I needed to review the cell phone information. Well, he's not a supervisor. You've argued that he's a supervisor, but as a legal proposition, I have difficulty understanding what the basis for that is. I mean, I think there's a dispute in the record about the capacity in which Defendant Carpenter is acting here, whether he's acting, at least in this, when he sends the letter to, when he is conducting this investigation, whether he's the DA or County Counsel, whether he's working for the Sheriff, or whether he's the District Attorney. And there's statements on both sides, and he says that I don't conduct workplace investigations in my capacity as District Attorney. And so I think there's a dispute, in fact, as to that. And in fact, if he's acting on- That still raises the question about supervisor. I mean, it's one thing to say, let's forget that he's the DA as a state official and treat him as a county attorney, but that doesn't mean that Palmer can order him what to do. Palmer, I mean, I think Palmer, in essence, did, I want to be careful with the word order, but did instruct him what to do. And in the DA capacity, they have to work together. So cooperation, I understand. But we don't have cooperator liability, and since your argument is supervisory liability, I'm not sure I understand what the basis for supervisor is. Sure, and I suppose our view is that in the capacity as Sheriff over the, Sheriff of the county, that Sheriff Palmer has authority over at least in county council in the ways that county council serves the Sheriff's office. That might be a stretch. Fair enough, Your Honor. And I want to be careful, be clear, too, this is not a phone call that Sheriff Palmer got from Idaho. This is a phone call that Sheriff Palmer made to Idaho, and that's at Excerpt of Record 128 in Sheriff Palmer's testimony. So he set in motion this series of acts by Grant County. This is not a circumstance in which Sheriff Palmer has nothing to do with it. The last point I wanted to make, I wanted to go back to Defendant Carpenter and just highlight his testimony in the record at 456 and 457, which is that he undertook this, he reached out to Idaho, because he understood that, at least from his conversation with Palmer, that plaintiff had consented to this extraction by Idaho authorities. And Idaho appeared willing to provide it. And he didn't think he needed a warrant, because they weren't undertaking criminal, they weren't, nobody had committed a crime. And if qualified immunity protects everything but the incompetent and the corrupt, this is, that to me is borderline incompetence under the Fourth Amendment, that's clearly a violation when you've got no suspicion of criminal activity, consent that does not extend to the search that you're undertaken, and no warrant to protect the individual. And all of that, I think, is clearly established in this court's and the Supreme Court's case law as a violation of the Fourth Amendment. With that, we'll request that the court reverse the district court's judgment. Thank you. Thank you, and we thank both counsel for the briefing argument. This matter is submitted.
judges: McKEOWN, CLIFTON, BRESS